KING, P.J.,
dissenting:
¶ 10. I dissent from the majority opinion herein.
¶ 11. The majority finds that (1) the defendant’s plea was done with sufficient knowledge and understanding to be voluntary and (2) the record contained a sufficient factual basis for the guilty plea.
¶ 12. Having read the record, I do not believe that to be the case.
¶ 13. Contrary to the majority opinion, Burks does not maintain repeatedly and without equivocation that he did the things charged.
¶ 14. This reality is seen in the following exchange between the judge and Burks, which constitutes the entirety of the relevant portions of the plea hearing:
‡ # ‡ ‡ sjc
Q. Demont, let me go over this with you. You say in this petition that I did willfully, unlawfully and feloniously take the personal property belonging to a Belinda Randall, three gold rings from a Crystal Lewis against her will, that is Ms. Lewis’ will by holding her down and putting her in fear of immediate injury to her person. Did you do that?
A. No, sir.
Q. You did not?
A. No, sir.
Q. Well, what happened back on June the 28th, 1996, that resulted in you being charged with a robbery charge? What did you do?
A. We were talking and she let me keep her rings, and her mother asked her where it was. She didn’t want to tell her. And then she told her I had them.
Q. You used the words her and hex-mother, give me names.
A. Crystal and her mother Belinda.
Q. Okay. Belinda Randall is Crystal’s mother?
A. Yes, sir.
Q. And you and Crystal were talking?
A. Yes, sir.
Q. That means verbal conversation like we are talking now?
A. No, sir.
Q. What does talking mean?
A. That means like a boyfriend/girlfriend type thing.
Q. Sexual type relationship?
A. Yes, sir.
Q. Boyfriend and girlfriend?
A. Yes, sir.
*849 Q. At that time?
A. Yes, sir.
Q. What happened?
A. Her momma then come — Belinda didn’t like me.
Q. Okay. So?
A. She pressed charges on me because I had her daughter’s ring, and she didn’t want me around her daughter.
Q. How did you come in possession of three gold rings?
A. Crystal let me wear the rings.
Q. Crystal gave them to you?
A. Yes, Sir.
‡ ;¡í # :¡: %
Q. Demont, what I am trying to say in a polite way to you, I don’t want to — I don’t care whether you go to trial or whether you plead guilty. What I desperately care about is making sure that if I take a guilty plea and find somebody to be guilty, that they did, in fact, do the crime that they are charged with doing?
A. Yes, sir.
Q. I don’t want to find somebody guilty that is innocence. What you are telling me is that you are innocent. Therefore, I will let you tell your story to a jury and let 12 jurors decide who they believe and who they don’t believe, okay?
A. Can I ask you a question? By me having the rings still in my possession, that means they can find me guilty, don’t it?
Q. This gentleman over here will have to convince 12 people, 12 strangers, jurors, beyond a reasonable doubt that you took that jewelry from Crystal Lewis against her will by placing her in fear of receiving some bodily harm. That is a robbery. In other words, you don’t give me the rings I am going to beat your brains out, or I am going to shoot you or cut you, and if he can’t convince a jury of that, then the jury under their oath would find you not guilty. On the other hand, if he can convince a jury of that beyond a reasonable doubt the jury’s duty is to return a verdict of guilty. And if you are found guilty, you’re looking at a maximum possible 15 year prison sentence, okay?
A. I want to take a plea, sir.
Q. I can’t take your plea if you are innocent, sir?
A. But I already signed the plea.
❖ * * * * *
Q. You signed something here under oath, right here. In other words, you told me earlier that’s your signature right there, right?
A. Yes, sir.
Q. And this document says I plead guilty, and I request the Court to accept my plea of guilty and to have entered my plea of guilty based upon the following. And it says on or about the 28th day of June, 1996, I, Demont Burks, willfully, unlawfully and feloniously took the personal property of Belinda Randall, that is, three gold rings from Crystal Lewis against her will by holding her down and putting her in fear of immediate injury to her person. And it is signed Demont Burks.
A. Yes, sir.
Q. That’s why I am asking you. When I read this it tells me that you admit that you did what you are charged with. Now, here in the courtroom, you are saying you didn’t do it. She gave you the rings. Earlier I had you raise your hand and swear to me you would tell me the truth?
A. Yes, sir.
Q. Ml I want to know is what is the truth?
A. That’s the truth, sir.
*850 Q. Which is truth? She gave them to you or you robbed her? I just want to know what the truth is.
A. I robbed her, sir.
Q. Is that the truth?
A. Yes, sir, that’s the truth, sir.
Q. Well, why did you tell me something different just a minute ago?
A. Because I was telling you how the whole story went, sir. that’s what you ask me. That’s what you asked me, sir.
Q. I thought I tried to ask you whether or not you did this crime, and- — •
A. Yes, sir.
Q. —you said no, you didn’t.
A. I did the crime, sir.
Q. That she gave it to you?
A. I did the crime.
Q. Sir?
A. Yes, sir, I did the crime.
Q. Are you now telling me the truth?
A. Yes, sir.
Q. Is what you told me earlier a lie?
A. Sir?
Q. Is what you told me earlier, that is, that she gave you the rings and her momma didn’t like you, and her momma wanted to charge you with it a lie?
A. I was breaking it down in details, sir. You asked me to tell you everything that happened, sir.
Q. Demont, I still don’t understand what you are saying, Did she voluntarily, of her- own free will, without any pressure or coercion or threats give you the gold rings?
A, Did she what, sir?
Q. I’ll say it once again. Did Crystal Lewis, your girlfriend, voluntarily, of her own free will, and without ' any threats or coercion or pressure give you those three rings?
A. No, sir.
Q. Did you take them from her against her will?
A. Yes, sir.
Q. Okay. Do you have any question or anything you don’t understand?
A. No, sir.
‡ ‡ ‡ ‡
¶ 15. There is, in my judgment, a sufficient lack of clarity in the totality of Burks’ remarks to call into question the voluntariness of his guilty plea or the factual foundation of his plea.
¶ 16. For these reasons, I would reverse the denial of post-conviction relief.
CHANDLER, J„ JOINS THIS ' OPINION.